IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

HENRY TONJE SMITH                                                                PLAINTIFF

        v.             Civil No. 05-2085

CPL. GADEKE, Jailer;
DEPUTY STEWART, Jailer;
CRYSTAL WHITE, Jail Nurse;
and CHRISTA MINTON,
Jail Nurse                                                                          DEFENDANTS

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

Henry Tonje Smith, a former inmate of the Sebastian County Detention Center, brings this pro se civil rights action pursuant to 42 U.S.C. § 1983. Smith contends his constitutional rights were violated in the following ways: First, he contends Cpl. Gadeke and Deputy Stewart used excessive force against him. Second, he contends Crystal White and Christa Minton denied him adequate medical care.

On August 29, 2005, defendants filed a motion for summary judgment (Doc. 12). By order entered on October 5, 2005, 2005 (Doc. 15), Smith was directed to complete, sign, and return an attached questionnaire that would serve as his response to the summary judgment motion. On October 21, 2005, plaintiff's response to the court's questionnaire (Doc. 16) was filed. The summary judgment motion is currently before the undersigned for issuance of this report and recommendation.

-1-

## I. BACKGROUND

On March 3, 2003, Smith was sentenced to a term of imprisonment on a federal criminal charge. *Plaintiff's Response* (hereinafter *Resp.*) at ¶ 2. He was booked into the Sebastian County Detention Center (SCDC) on April 9, 2003, on a hold for the United States Marshal. *Id.* at ¶ 1.

According to the incident report prepared by Deputy McCaslin, on April 9, 2003, at approximately 21:35, or 9:35 p.m., he and Deputy Stewart opened the window to H-1 and saw Smith walking around yelling at other inmates and hitting the door. *Defendants' Exhibit* 2. McCaslin and Stewart were working intake and Smith was in H-1. *Id.*

Smith had been placed in the holding cell around 11:30 a.m. by officers on the previous shift or troop. *Resp.* at ¶ 5. The previous shift or troop (troop 3) had told McCaslin and Stewart that Smith had been uncooperative all day long. *Defts' Ex.* 2.

Stewart was asked to explain what had occurred earlier in the day when the deputies attempted to book him in. He responded:

> The booking officer was a female blonde hair. I believe someone said her first name was Susan. She wanted to no my middle name which was of no important to me being booked in for being transfed from another jail and this is what the plaintiff said I am not under arrest I am not being charge with any crime and I have the right to remain silience under the 5th Admendment.

*Resp.* at ¶ 6(B). Notations were made that Smith was uncooperative with the intake officers at 11:49 (11:49 a.m.); 19:30 (7:30 p.m.) and 20:45 (8:45 p.m.). *Defts' Ex.* 3.

McCaslin and Stewart opened the door to H-1 and asked Smith if he wanted to cooperate and get booked in. *Defts' Ex.* 2. Smith states they never mentioned anything about his middle name. *Resp.* at ¶ 8. Instead, he states he was just asked if he would cooperate and he wasn't doing anything. *Id.* He maintains he was being harassed. *Id.*

AO72A
(Rev. 8/82)

According to McCaslin and Stewart, after they asked Smith if he wanted to cooperate, he became verbally abusive towards them. *Defts' Ex.* 2. Smith, however, asserts that the defendants have a conflict of interest in making these statements and are not reliable. *Resp.* at ¶ 9. He also maintains he was being harassed because he would not give his middle name. *Id.*

The incident report states:

> [SMITH] THEN WALKED TOWARDS MYSELF AND DEPUTY STEWART IN A AGGRESIVE MANNER. DEPUTY STEWART ADVISED HIM TO STOP. INMATE SMITH CONTINUED TO WALK TOWARDS US IN A AGGRESIVE MANNER WITH BOTH HANDS CLINCHED. DEPUTY STEWART THEN TOLD INMATE SMITH TO PUT HIS ARMS BEHIND HIS BACK. HE REFUSED. MYSELF AND DEPUTY STEWART THEN PLACED INMATE SMITH IN ARMBAR RESTRAINTS AND ESCORTED HIM TO THE C-8 REC. YARD FOR A COOL DOWN PERIOD. DURING THE MOVING PROCESS, INMATE SMITH FELL DOWN. MYSELF AND DEPUTY STEWART THEN LIFTED INMATE SMITH BACK TO HIS FEET WITH BOTH ARMS RESTRAINED. DURING THE FALL, INMATE SMITH APPARENTLY FELL ON HIS FINGERS CAUSING INMATE SMITH TO JAM HIS FINGERS. AFTER ABOUT 15 MINUTES OF A COOL DOWN PERIOD INMATE SMITH SAID HE WOULD COOPERATE AND WAS THEN BOOKED IN ON A US MARSHALS HOLD. AFTER INMATE SMITH WAS BOOKED IN, CPL. GADEKE ESCORTED INMATE SMITH TO THE RN'S OFFICE TO HAVE HIS RIGHT HAND EXAMINED. THE NURSE SAID THAT INMATE SMITH HAD JAMMED HIS FINGERS. INMATE SMITH APPEARED TO HAVE NO OTHER INJURIES. NO FURTHER TO REPORT.

*Defts' Ex.* 2.

Smith replies to each question regarding this portion of the incident report by stating he is without knowledge to agree or disagree. *Resp.* at ¶ 9 to ¶ 20. The only exception is that he contends he did not fall down. *Id.* at ¶ 17. Instead, he states defendants threw him to the floor after they ordered him out of the cell. *Id.* While he was laying on the floor, he maintains one of the defendants broke his finger. *Id.* He then states they broke his finger by forcing him to get up

-3-

and stand on his own. *Id.* at ¶ 18. Plaintiff indicates he is handicapped in one leg as a result of polio. *Id.* He also remarks that there were no cameras in the area. *Id.* at ¶ 10.

As a result of being slammed to the hard floor, plaintiff states his finger, right hand, right arm, right shoulder, and lower back are still hurting. *Resp.* at ¶ 19(C). He states the only medication he was given was Tylenol and Ibuprofen. *Id.*

With respect to Smith's being booked in, Smith states he had no choice but to do what the defendants wanted. *Resp.* at ¶ 21. According to defendants' records, Smith could not sign the medical questionnaire completed as part of the booking process because of his injured finger. *Defts' Ex.* 4. No medical problems were noted other than a possible broken finger (R middle) and a stomach/digestive illness. *Id.*

Smith indicates he did not know who took him to the nurse's office because the officer kept one of his hands over his name plate. *Resp.* at ¶ 22. Smith was seen by Nurse Christa Minton. *Defts' Ex.* 6. Nurse Minton noted the middle finger on Smith's right hand was swollen. *Defts' Ex.* 5 & *Ex.* 6. She stabilized the finger, gave Smith 800 mg. of Ibuprofen, ordered more Ibuprofen for 6:00 a.m., and advised Smith that if the finger still hurt in the morning to submit a request to see Dr. Tinsman. *Id.*

Smith asserts he did not know the nurse's name but that he asked to go to the emergency room. *Resp.* at ¶ 23. He states his request was denied. *Id.* He believes the nurse was incompetent to determine whether or not his finger was broken. *Id.* Smith states he even knew his finger was broken. *Id.* at ¶ 24.

Smith requested medical treatment on April 10, 2003. *Resp.* at ¶ 25. He stated that at 7:00 p.m. on the night before five deputies had dragged him out of his cell and one of them broke his

AO72A
(Rev. 8/82)

right middle finger. *Id.* He requested immediate attention from the doctor. *Id.* No mention is made of any injuries other than the injury to his finger.

Smith was seen by Nurse Crystal White. *Defts' Ex.* 7 & *Ex.* 8. The nurse examined Smith's finger and after talking to Dr. Tinsman she immobilized his finger and ordered additional Ibuprofen for pain. *Id.* The nurse informed Smith that he could see the doctor the following week if there was no improvement in his finger. *Id.*

Smith received Ibuprofen from April 10, 2003, until April 18, 2003. *Defts' Ex.* 16. Smith indicates he was still in pain but was cut off. *Resp.* at ¶ 34.

On April 11, 2003, Smith was transported to the health department by Officer Gibson. *Resp.* at ¶ 27. According to defendants' records, he was seen and noted to have no symptoms of tuberculosis (TB). *Defts' Ex.* 10. On April 16, 2003, the Smith's chest x-ray was noted to have been clear and he was given TB clearance. *Defts' Ex.* 13. On May 7, 2003, his "PPD" was completed and his TB clearance was given. *Defts' Ex.* 14 & *Ex.* 15. Smith, however, states he has TB and tested positive at the SCDC. *Resp.* at ¶ 28. *See also Resp.* at ¶ 32 & ¶ 33.

On April 12, 2003, Smith requested medical treatment because of constipation. *Resp.* at ¶ 29. He asked for stool softeners. *Id.* Nurse Crystal White gave Smith Dulcolax 10 mg., a stool softener, each evening for three evenings and told him to drink lots of water. *Defts' Ex.* 11 & *Ex.* 12. Smith asserts he asked to have the stool softeners for the duration of his stay at the SCDC but his request was refused. *Id.*

Smith did not mention his right middle finger in the April 12th request for treatment. *Defts' Ex.* 11. There is no record of Smith submitting any further requests for treatment for his finger. Smith does not provide any specifics or submit any copies of requests he did submit.

AO72A
(Rev. 8/82)

Instead, he merely states he was denied every time he asked to be taken to see the doctor or to a hospital. *Resp.* at ¶ 30.

Crystal White Reed and Christa Minton were both registered nurses employed at the SCDC to evaluate medical complaints of detainees and determine a course of treatment for those detainees who need medical treatment. *Defts' Ex.* 18 at ¶ 2. As part of their duties, the nurses evaluate, on a regular basis, inmates who indicate they may have jammed or broken fingers. *Id.* at ¶ 3. Each inmate's finger is evaluated and the course of medical treatment is dependent upon what the nurse observes when viewing the injured finger. *Id.* at ¶ 4.

When an inmate's finger is swollen the nurse will stabilize the finger and provide pain medication to the inmate. *Defts' Ex.* 18 at ¶ 5. Stabilization of an injured finger is done by taping the finger to another finger. *Id.* If there is no improvement of the finger once it has been stabilized, the inmate's finger will be immobilized and the inmate will be given pain medication. *Id.* at ¶ 6.

If there is no improvement once the finger has been immobilized, then the inmate may ask to see the doctor for further evaluation including an x-ray of the finger. *Defts' Ex.* 18 at ¶ 7. If the inmate is examined by the nurse and there is an obvious deformity of the finger, the inmate is taken immediately for x-rays to determine the extent of the injury. *Id.* at ¶ 8.

The treatment of an injured finger after an x-ray, depends upon the extent of the injury. *Defts' Ex.* 18 at ¶ 9. If the finger is jammed or there is a simple fracture, the medical staff may stabilize or immobilize the finger. *Id.* If the fracture is complex, the medical staff may seek the advice of an orthopedic surgeon. *Id.*

Smith asserts his finger was broken not jammed. *Resp.* at ¶ 37. In support, he attaches a radiologic consultation report dated May 30, 2003. *Plff's Ex.* 1. The report indicates there is a "minimally displaced oblique fracture through the mid shaft of the proximal phalanx of the middle finger" of the right hand. *Id.* The x-ray was requested by Dr. Joe Rankin who examined Smith on May 22, 2003, and noted swelling of Smith's right hand, in particular the third finger, and a decreased range of motion. *Id.* Note was made that there Smith had a history of a hyperflexion injury. *Id.*

Smith contends Nurse White and Nurse Minton were incompetent. *Id.* at ¶ 38 and ¶ 39. He indicates stabilization of a broken finger is done with an immobilizer that acts as a splint. *Id.* at ¶ 40. He contends the two pieces of tape the nurse put on his fingers did nothing to keep his broken finger straight. *Id.*

Smith maintains he never showed any improvement. *Resp.* at ¶ 41. He indicates no x-ray was taken and his finger is still crooked. *Id.* at ¶ 41 & ¶ 43.

With respect to Gadeke, Smith contends Gadeke was "part" of the "vicious attack." *Resp.* at ¶ 46. Smith was asked to describe in detail the amount of force used by Stewart and any injury he suffered as a result of the use of force. Smith replied: "from a scale from 1 to 10 it would be a (10)." *Resp.* at ¶ 47.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986), the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as

AO72A
(Rev. 8/82)

a matter of law." Fed. R. Civ. P. 56(c). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *National Bank*, 165 F.3d at 607 (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (*citing Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).

### III. DISCUSSION

Defendants contend they are entitled to summary judgment in their favor. First, they contend no excessive force was used against Smith. Second, defendants contend they were not deliberately indifferent to Smith's serious medical needs. Finally, defendants contend there is no evidence of any unconstitutional county policy.

*Excessive Use of Force*

"In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." *Graham v. Connor*, 490 U.S. 386, 394, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989). "[T]he constitutional standard applied may vary depending upon whether the victim is an arrestee, a pretrial detainee, or a convicted inmate of a penal institution." *Andrews v. Neer*, 253 F.3d 1052, 1060 (8th Cir. 2001).

AO72A
(Rev. 8/82)

In this case, defendants have stated Smith was treated as a pretrial detainee because he was booked into the SCDC on a hold by the U.S. Marshal Service. *Defts' Brief* (Doc. 13) at page 1. As Smith had been convicted and was serving a sentence while detained at the SCDC, it is not clear to the court why defendants believe he should be treated as a pretrial detainee. However, as a pretrial detainee has a lighter burden of proof, if plaintiff cannot survive summary judgment under this standard, he certainly cannot withstand summary judgment under the standard applicable to convicted inmates. We will therefore treat Smith as a pretrial detainee.

In *Johnson-El v. Schoemehl,* the Eighth Circuit court noted that:

> [u]nlike convicted prisoners, the state has no right to punish [pretrial detainees]. *Bell v. Wolfish*, 441 U.S. 520, 535, 99 S. Ct. 1861, 1871-72, 60 L. Ed. 2d 447 (1979). Their confinement conditions are analyzed under the due process clause of the Fifth and Fourteenth Amendments rather than the Eighth Amendment's "cruel and unusual punishment" standard which is used for convicted prisoners. *Id*. The injuries detainees suffer must be necessarily incident to administrative interests in safety, security and efficiency. As a pretrial detainee, Freeman's excessive-force claim is properly analyzed under the due process clause of the Fourteenth Amendment. *See Graham v. Conner*, 490 U.S. 386, 395 & n. 10 (1989) (due process clause protects pretrial detainee from force amounting to punishment).

*Johnson-El v. Schoemehl*, 878 F.2d 1043, 1048 (8th Cir. 1989).

The courts generally analyze excessive force claims of pretrial detainees in the same way as those of arrestees. *Andrews v. Neer*, 253 F.3d 1052, 1060 (8th Cir. 2001)("The evaluation of excessive-force claims brought by pre-trial detainees, although grounded in the Fifth and Fourteenth Amendments rather than the Fourth Amendment, also relies on an objective reasonableness standard."). The use of force must be necessary to some legitimate institutional interest such as safety, security, or efficiency, and the force used must not be in excess of that reasonably believed necessary to achieve those goals. *Schoemehl*, 878 F.2d at 1048. The relevant

inquiry being whether the officials behaved in a reasonable way in light of the facts and circumstances confronting them. *See e.g., Wilson v. Williams*, 83 F.3d 870, 875 (7th Cir. 1996).

In this case, Smith asserts that defendants threw him to the floor after he was ordered out of the holding cell and while he was laying there one of the defendants broke his finger. *Resp.* at ¶ 17. He also states that "[t]hey broke my finger by forceing me to get up and stand on my own and the Plaintiff is handicap in one leg from the polio." *Id.* at ¶ 18.

Smith contends both Gadeke and Stewart used excessive force against him. However, defendants' records indicate it was McCaslin and Stewart who had an encounter with Smith. *Defts' Ex.* 2. Smith does not deny that McCaslin and Stewart were the two deputies who came to H-1 and asked him if he wanted to cooperate and get booked in. Instead, in response to virtually every question regarding the report written by McCaslin, Smith indicated he was without knowledge to agree or disagree. *See Resp.* at ¶ 4, ¶ 6(A), ¶ 8-¶ 16, ¶ 18-¶ 20. When Smith was asked to describe in detail how Gadeke violated Smith's federal constitutional rights, he responded that Gadeke was part of the vicious attack on him. *Resp.* at ¶ 46. He provided no other details. With respect to the amount of force used by Stewart, Smith contends the force on a scale of one to ten would be considered a ten. *Id.* at ¶ 47.

Applying the applicable law to the facts of this case, the court concludes no genuine issues of fact exist as to whether Gadeke or Stewart used excessive force against Smith. Smith has provided the court with no details surrounding the alleged use of force by these defendants. Although Smith contends he has no knowledge regarding the vast majority of the conduct attributed to him by defendants instead asserting only that McCaslin had a conflict of interest in making the incident report, Smith admits that he refused to provide his middle name when

-10-

personnel attempted to book him because he did not believe it was relevant as he was not "under arrest" and being charged with a crime. *Resp.* at ¶ 6. He also states he was told he was not being cooperative by Cpl. Bender. *Id.* at ¶ 7.

Smith additionally provides contradictory accounts of how his finger was broken. In his summary judgment response he initially states it was broken by one of the defendants as he was laying on the floor after being thrown down. *Resp.* at ¶ 17. He then states it was broken when he was forced to get up and stand on his own. *Id.* at ¶ 18. In the medical request he submitted on April 10, 2003, Smith states his finger was broken when he was being dragged out of his cell by five deputies. *Defts' Ex.* 8. Smith does not identify the deputies allegedly involved in his medical request.

Smith alleges he suffered injuries to his finger, right hand, right arm, right shoulder, and lower back, *resp.* at ¶ 19(B). Smith has provided the court with absolutely no details about these other alleged injuries. Furthermore, while he requested medical treatment several times during his incarceration at the SCDC, his medical requests never mentioned any injury, other than the injury to his finger, he sustained as a result of the use of force by officers.

In opposing summary judgment, Smith cannot merely state that he has no knowledge regarding the facts asserted by the defendants. Instead, he must "designate specific facts showing a genuine issue for trial." *Hernandez v. Jarman*, 340 F.3d 617 (8th Cir. 2003)(*citing Brandt v. Davis*, 191 F.3d 887, 891 (8th Cir. 1999)(affirming grant of summary judgment in favor of defendants in an excessive force case because plaintiff failed to submit any evidence contradicting defendants' version of the incident)). Smith has failed to present evidence sufficient to create a

genuine issue of material fact as to whether either Gadeke or Stewart used excessive force against him.

### *Denial of Adequate Medical Care*

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *County of Sacramento v. Lewis*, 523 U.S. 833, 118 S. Ct. 1708, 1719, 140 L. Ed. 2d 1043 (1998)(citation omitted). The Eighth Circuit in analyzing inadequate medical care claims brought by both pretrial detainees and convicted prisoners has applied the Eighth Amendment's deliberate indifference standard. *See e.g., Hartsfield v. Colburn*, 371 F.3d 454, 456-457 (8th Cir. 2004); *Spencer v. Knapheide Truck Equipment Co.,* 183 F.3d 902, 905-06 (8th Cir. 1999); *Hall v. Dalton*, 34 F.3d 648, 650 (8th Cir. 1994)(analyzing a pretrial detainee's claim of inadequate medical care under the deliberate indifference standard). "In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976).

The deliberate indifference standard includes "both an objective and a subjective component: 'The [plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'" *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000)(*quoting Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir.1997)). Additionally, "'[t]he prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise

to the level of a constitutional violation.'" *Jolly*, 205 F.3d at 1096 (*quoting Estate of Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir.1995)).

"Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Hudson v. McMillian*, 503 U.S. 1, 9, 112 S. Ct. 995, 1000, 117 L. Ed. 2d 156 (1992). "A medical need is serious if it is obvious to the layperson or supported by medical evidence." *Moore v. Jackson*, 123 F.3d 1082, 1086 (8th Cir. 1997) (per curiam) (internal quotation and citation omitted).

In this case, Smith was seen by the Nurse Minton shortly after his finger was injured. The finger was stabilized, he was immediately given Ibuprofen, and more Ibuprofen was ordered for the morning. *Defts' Ex.* 5. He was advised that if the finger still hurt in the morning to submit a request to see the doctor. *Id.* No other injuries were noted. *Defts' Ex.* 5 & *Defts' Ex.* 6.

Smith requested medical attention again the following day. *Defts' Ex.* 8. The only injury he mentioned was the injury to his finger. *Id.* Smith was seen that day by Nurse White. *Defts' Ex.* 7 & *Defts' Ex.* 8. His finger was examined and Dr. Tinsman consulted. *Id.* The finger was immobilized and Ibuprofen ordered for the pain. *Id.* If the finger did not improve, a note was made that Smith could see the doctor the following week. *Id.* Although Smith requested medical attention on April 12, 2003, the request contained no mention of the injury to his finger or any other injuries. *Defts' Ex.* 11. The record contains no other requests for medical treatment.

We find no genuine issues of material fact exist as to whether Nurse White or Nurse Minton exhibited deliberate indifference to Smith's serious medical needs. Smith was seen and

to the level of a constitutional violation.'" *Jolly*, 205 F.3d at 1096 (*quoting Estate of Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir.1995)).

"Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Hudson v. McMillian*, 503 U.S. 1, 9, 112 S. Ct. 995, 1000, 117 L. Ed. 2d 156 (1992). "A medical need is serious if it is obvious to the layperson or supported by medical evidence." *Moore v. Jackson*, 123 F.3d 1082, 1086 (8th Cir. 1997) (per curiam) (internal quotation and citation omitted).

In this case, Smith was seen by the Nurse Minton shortly after his finger was injured. The finger was stabilized, he was immediately given Ibuprofen, and more Ibuprofen was ordered for the morning. *Defts' Ex.* 5. He was advised that if the finger still hurt in the morning to submit a request to see the doctor. *Id.* No other injuries were noted. *Defts' Ex.* 5 & *Defts' Ex.* 6.

Smith requested medical attention again the following day. *Defts' Ex.* 8. The only injury he mentioned was the injury to his finger. *Id.* Smith was seen that day by Nurse White. *Defts' Ex.* 7 & *Defts' Ex.* 8. His finger was examined and Dr. Tinsman consulted. *Id.* The finger was immobilized and Ibuprofen ordered for the pain. *Id.* If the finger did not improve, a note was made that Smith could see the doctor the following week. *Id.* Although Smith requested medical attention on April 12, 2003, the request contained no mention of the injury to his finger or any other injuries. *Defts' Ex.* 11. The record contains no other requests for medical treatment.

We find no genuine issues of material fact exist as to whether Nurse White or Nurse Minton exhibited deliberate indifference to Smith's serious medical needs. Smith was seen and

AO72A
(Rev. 8/82)

evaluated shortly after the incident occurred during which his finger was injured. The jail nurses consulted with the jail doctor and provided treatment and medication to relieve Smith's pain.

His allegations that the jail nurses should have sent him to the hospital for x-rays or offered additional treatment are at best allegations that state a difference of opinion between himself and the nurses or allege a mistake in diagnosis or treatment. "Neither differences of opinion or medical malpractice state an actionable Constitutional violation." *Jones v. Norris*, 310 F.3d 610, 612 (8th Cir. 2002)(citations omitted). Nor is there any indication the procedures the jail nurses used to stabilize or immobilize his finger were so inappropriate so as to constitute intentional maltreatment. *See Smith v. Jenkins*, 919 F.2d 90, 93 (8th Cir. 1990)(medical care so inappropriate as to evidence intentional maltreatment or refusal to provide essential care violated the Eighth Amendment).

## IV. CONCLUSION

I therefore recommend that defendants' motion for summary judgment be granted and this case be dismissed.

**The parties have ten days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 27th day of October 2005.

/s/ Beverly Stites Jones
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)